## Searcy v. Commonwealth.

(Decided June 8, 1920.)

### Appeal from Jefferson Circuit Court (Criminal Division).

Criminal Law—Argument of Counsel—Witnesses.—Where the Commonwealth's attorney in a closing argument in a criminal case, declares that a certain named witness testified to a material fact, when in truth and in fact the witness did not so testify, and when objected to by counsel for defendant the court sustains the attorney for the Commonwealth with the statement "that is correct," the error is so prejudicial to the rights of defendant as to entitle him to a new trial.

BRENT C. OVERSTREET and HOMER C. McCLELLAN for appellant.

CHARLES I. DAWSON, Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE SAMPSON—Reversing.

Appellant Sam Searcy shot and killed Henry Barger in the city of Louisville in May, 1918. An indictment charging Searcy with the willful murder of Barger was returned by the Jefferson county grand jury and a trial was had resulting in a hung jury. Another trial was had on February 19, 1919, and the defendant found guilty and his punishment fixed at confinement in the state penitentiary for life. He prosecutes this appeal.

In his motion and grounds for a new trial he complains that the trial court admitted incompetent evidence offered by the Commonwealth concerning the application of the deceased Barger to a police officer for a warrant for appellant Searcy and others; the said application and conversation concerning same being made out of the presence and hearing of Searcy, and also because the court allowed the Commonwealth to introduce evidence showing that Mrs. Babcock, daughter of deceased, had not placed flowers upon the grave of her father. All this evidence was objected to by defendant Searcy but his objection was overruled by the court and the evidence allowed to go to the jury. Complaint is also made by appellant of the failure of the trial court to allow him to introduce evidence of threats by deceased against other persons for the purpose of showing animus in deceased's mind at the time of and

shortly before the tragedy, but the chief complaint of appellant is of improper argument of the attorney for the Commonwealth in concluding the case.

Barger lived with his family on Seventh Street, in Louisville, and his wife conducted a boarding house at which appellant Searcy, his brother and some other persons boarded and were lodged. Barger himself had no regular occupation about Louisville but stayed a large part of the time in Indiana, only occasionally coming home to spend a few days with the family. Searcy had employment at a mill or factory in the city of Louisville and went to work about six o'clock in the morning. On Thursday before the killing happened on Monday morning, Barger came home and going upstairs to the family room he saw his married daughter, Mrs. Babcock, and appellant Searcy sitting on a bed, Mrs. Barger was out of the house attending to some shopping; Barger became enraged at Searcy and Mrs. Babcock because they were sitting on the bed together and began to make complaint and to privately threaten both of them with death. According to the evidence the appellant was shortly thereafter informed that Barger had threatened his life, and on Sunday he approached Barger and asked him if he had made such threats, whereupon Barger denied having used such language. They talked the matter over, however, and composed their differences and the whole matter was dropped. Barger and Searcy returning to the house together. Later that evening Searcy and his brother and one of the Barger boys went into the city and remained until 10 or 11 o'clock that night. When they came in Mrs. Barger and some of the children were down stairs in the dining room or kitchen and when asked why they did not go to bed, gave the information that Barger was upstairs and had threatened to kill them all and to kill Searcy also. At the time Searcy received this information he was on his way to bed and he and his brother shortly thereafter retired, but Searcy deposes that he did not sleep but very little that night because he was in fear of Barger. He says about the time he went to bed he placed a pistol on the davonette nearby so that he could defend himself. Barger's room was next to where Searcy slept, but he did not see Barger that night. Next morning early Searcy arose and went down stairs and ate his breakfast; he then went back upstairs for the purpose of getting his cap and some medicine to put on his face. In

going from the stairs to Searcy's room he had to pass the room of Barger. After Searcy had obtained his cap and was leaving his room passing the door of Barger he says Barger suddenly appeared in the door with an open knife raised in a striking position, saying, "now" and at the same time striking at Searcy with the knife, who at the same instant fired several shots into the body of Barger, killing him almost instantly. No one saw the shooting, but two of the young Barger boys were sleeping on a couch or bed in the upper hallway and were awakened by the sound of the gun. Being drowsy and more or less alarmed they did not know exactly what had happened and reported to the family down stairs that their father had committed suicide. This story was told by the family to the police officers who appeared on the scene very shortly afterwards. Searcy was arrested and charged with the crime and very soon thereafter told the same story in substance that he testified to on the witness stand.

On the trial officer Loran was called as a witness for the Commonwealth and was asked, among other things:

"Q. What time did Mr. Barger go there on that occasion? A. On Sunday he came to me about one o'clock in the afternoon. Q. I will get you to state to the jury whether or not he endeavored on that occasion to get a warrant against three men? A. Yes, sir. Q. I will get you to state to the jury whether or not one of the men he was trying to get a warrant against at that time was this defendant, Searcy? A. Yes, sir."

This happened on Sunday before the killing on Monday morning about six o'clock, and this testimony was all objected to by appellant on the ground that unexplained it raised in the minds of the jury a belief that Searcy had threatened violence to Barger or had committed some offense against him or his family. It is also objected to because the statements were made to the officer out of the presence and hearing of appellant. While we regard this evidence as incompetent it is not so prejudicial as would warrant this court in reversing the judgment, but as there must be another trial for other reasons, the evidence given by officer Loran as to what was said to him by deceased on the Sunday before the killing will be excluded.

On the trial Martha Barger, sister of deceased, was called as a witness for the Commonwealth, and was asked:

"Q. I will ask you if on the day or the night that your brother was killed, if his wife told you that her husband, Henry Barger, had ordered Sam Searcy to leave his home? A. She told me that he did. Q. I will ask you if she further told you the reason he ordered him to leave his home was because he had gone home and found Searcy and his daughter, Mrs. Babcock, in the bed? A. Yes, she did."

In his closing argument Mr. Huffaker, Commonwealth's attorney, referring to Searcy, exclaimed, "He said he was afraid of this dead man, that he had been told of his threats. If you were afraid of him why did you go back there that night? It was his home; it was his castle; he had a right there and you had none there, when he had ordered you out."

To this assertion counsel for appellant objected, saying: "There is no proof he was ever ordered out of the place." Mr. Huffaker responded, "There was proof from old Martha Barger he had ordered him out." By the court: "That is correct;" by Mr. Huffaker: "Very strong proof he was ordered away from there "

To all of this appellant Searcy objected and excepted at the time. As will be observed from reading the testimony of Martha Barger she did not testify that her brother Henry Barger had ordered Searcy from his home, but Martha Barger only testified that the wife of Henry Barger had told her Henry Barger had ordered Searcy from his house. What she stated was the merest hearsay and was allowed only for the purpose of contradicting the wife of Barger who had testified that she had not made such statements. The court had properly admonished the jury that the evidence of Martha Barger on that subject could be received and considered only for the purpose of contradicting the witness, Mrs. Barger, if in their judgment it did so do. However, when the question was raised by the Commonwealth's attorney at the conclusion of the case, and the attorney had asserted that Martha Barger had testified that Henry Barger had ordered Searcy away from the house, the court promptly sustained the Commonwealth attorney and made the statement to the jury in substance that the declaration of the attorney in his argument was correct, when in truth and fact it was not so. Such a statement was calculated to mislead and deceive the jury and was highly prejudicial to the rights of appellant Searcy, his theory being that as a boarder at the

Barger home he was entitled to go and come at pleasure since he had composed all differences with Henry Barger and had paid his board in advance for some weeks. There was no evidence whatever to support the declaration that Barger had ordered Searcy away from his home and the Commonwealth's attorney, improperly charged Searcy with remaining at the home after he had been ordered to leave. This was bad enough, but when the trial judge in the presence and hearing of the jury and over the protest of counsel for appellant declared that the evidence did show that Barger had ordered Searcy away from his home, it upset entirely the whole theory of the defense and no doubt was largely responsible for the verdict by the jury.

For the reasons indicated the judgment is reversed for a new trial consistent with this opinion.

Judgment reversed.