782 F.2d 1042
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
ROBERT L. LANDERS, Petitoner-Appellant;
v.
JOHN D. REES AND ATTORNEY GENERAL OF KENTUCKY Respondents-Appellees.
 85-5047
 United States Court of Appeals, Sixth Circuit.
 12/23/85
 
 BEFORE: LIVELY, Chief Judge; JONES and WELLFORD, Circuit Judges.
 PER CURIAM.
 
 
 1
 Robert Landers appeals the district court's denial of his habeas corpus petition brought under 28 U.S.C. Sec. 2254. He alleges that his trial in state court did not satisfy the requirements of the Sixth Amendment because he did not receive effective assistance of counsel. After studying the record and briefs, we conclude that counsel's performance was not reasonably competent under the standards articulated by the United States Supreme Court and by this court. We therefore reverse the district court's denial of habeas relief and remand Lander's petition for issuance of the writ unless the State of Kentucky retries him within a reasonable time.
 
 
 2
 Beginning in 1974, two of Robert Landers' children from his previous marriage, David and Sherry, came to live with him and his second wife, Vernell, in Jefferson County, Kentucky. In 1978 and possibly earlier, Landers and Vernell engaged in frequent, heated arguments, and Vernell periodically left and stayed in Muhlenberg County with her family.
 
 
 3
 In early August 1978, Vernell left Landers and took their three children, Cindy, Phillip and another child, with her to Muhlenberg County. David and Sherry stayed behind with their father. David was thirteen and Sherry eleven years old. Sherry was still in first grade despite her age.
 
 
 4
 Landers went to Muhlenberg County on August 12 or 13 and compelled Vernell to return with him to their Jefferson County residence. When Vernell returned to the house, Sherry talked to Vernell and revealed that her father had been doing certain things to her. According to Sherry's description of these incidents, Landers had raped and sodomized Sherry repeatedly. He had also allegedly made David do the same while he watched, and made Sherry perform oral sex on David. David said he was running away. Then he said he was calling the police, and Vernell agreed he should do so. Thus on the evening of August 14, 1978, David left the house, called the police, and reported that his father had been raping his eleven-year-old sister. David was soon picked up by police at a shopping plaza and Sherry was picked up from the house the next day.
 
 
 5
 Sherry was taken to Children's Hospital. She was examined by Dr. Algrin on August 15 for the purpose of determining whether there was medical evidence of rape or sodomy. The doctor found no evidence of recent physical trauma to the vagina or rectum, although he did find that the hymen was not intact. Both children made statements that their father, Robert Landers, had on several occasions performed certain sexual acts on Sherry and that he had made David participate. Sherry stated that these events had begun two or three years before, while David said they had begun two or three months before. Sherry was taken to the Home for Innocents, and later to the home of an aunt in Muhlenberg County.
 
 
 6
 Robert Landers was indicted in September 1978 for first degree rape and first degree sodomy of a minor in violation of Ky. Rev. Stat. Secs. 510.040 and 510.070. The indictment charged that these acts occurred between July 14, 1978 and August 14, 1978.
 
 
 7
 Landers' defense at trial was that Vernell, by then his ex-wife, had persuaded Sherry and David to fabricate the charges of rape and sodomy. Landers said that he and his wife had been fighting a great deal and that Vernell wanted to retaliate against him. Landers contended that when David called the police, David was angry about being disciplined by his father.
 
 
 8
 The government called ten witnesses, including Sherry, David, Vernell and the children's paternal grandmother, Mary Mannering. Before trial, David changed his story completely. During trial, David testified that none of the events occurred, and when questioned about his prior statement, said he had been lying before. The defense called only one witness, the defendant Landers. Landers was convicted of first degree rape and sodomy on a jury verdict of guilty on both counts. He was sentenced to two sentences of life imprisonment to run concurrently.
 
 
 9
 He appealed to the Kentucky Court of Appeals, asserting errors in jury selection and jury instruction. The conviction was affirmed. Then, under a Kentucky rule of criminal procedure, Landers collaterally attacked his conviction by a motion for post-conviction relief in the trial court, alleging ineffective assistance of counsel, newly discovered evidence, improper closing argument, and refusal to admit polygraph test results.
 
 
 10
 The state court rejected these claims and denied relief. In regard to the ineffectiveness claim, the court applied a test under which it determines whether the errors of counsel were so gross as to shock the conscience or render the proceedings a farce and a mockery of justice. See Commonwealth v. Landers, No. 79CR0168, slip op. at 5 (Jefferson Cir. Ct. January 12, 1982) (citing Brooks v. Commonwealth, 461 S.W.2d 547 (Ky. 1970)). The court noted that 'the case was admittedly a close issue,' but maintained that the evidence was sufficient to send the case to the jury. The court found it to be 'of critical importance' that in the intervening years since the conviction, Sherry had not come forward with an affidavit saying she had lied at the trial.
 
 
 11
 Landers then appealed the denial of his motion to the state appellate court and also filed his petition for a writ of habeas corpus in federal court. After Landers exhausted several of his claims in state court, the district court proceeded. In March 1984, the district court dismissed all claims but the claim of ineffective assistance of counsel. Landers had exhausted his state remedies on this claim. A magistrate held a hearing and submitted recommendations to the district judge. After reviewing the tapes of the hearing, the district judge denied the writ. On appeal, Landers argues that the writ should have been granted on the grounds of ineffective assistance of counsel.
 
 
 12
 * A defendant's right to effective assistance of counsel is fundamental. United States v. Cronic, 104 S. Ct. 2039, 2043-45 (1984). This right plays a crucial role in assuring the defendant a fair trial under the Sixth Amendment. Id. at 2044-45; Strickland v. Washington, 104 S. Ct. 2052, 2063 (1984). To show a violation of the Sixth Amendment right to effective assistance of counsel, the defendant must prove both that counsel's performance was deficient and that as a result the trial proceedings were unreliable. Strickland, 104 S. Ct. at 2064. Cronic, 104 S. Ct. at 2046.
 
 
 13
 The burden of proof rests on the defendant to demonstrate a violation of the constitutional right to effective assistance of counsel. Cronic, 104 S. Ct. at 2046. This burden means that the defendant must overcome the presumption that the lawyer was competent to provide adequate assistance and was conscientious in discharging his duty to the defendant. Id. at 2046 & n.23. Our scrutiny of trial counsel's performance must be highly deferential. Strickland, 104 S. Ct. at 2065. We must evaluate the acceptability of the decisions and strategies as of the time of the trial and not from the vantage point of post trial second-guessing. Id. at 2065-66.
 
 
 14
 In the first step of our analysis, we measure the attorney's competence against an objective standard: 'what a reasonably competent attorney could be expected to have done under the circumstances.' Cronic, 104 S.Ct. at 2051. This court has often said that the defendant's counsel 'must perform at least as well as a lawyer with ordinary training and skill.' See e.g., Meeks v. Bergen, 749 F.2d 32, 327 (6th Cir. 1984) (quoting Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974)). As long as reasonable investigation is pursued, strategy decisions are rarely overturned. Strickland, 104 S.Ct. at 2066; Meeks, 749 F.2d at 328. Counsel's failure to pursue a substantial defense, however, violates the defendant's constitutional right when the failure is a result of ineffectiveness or incompetence. See, e.g. Beasley, 491 F.2d at 696. In determining whether counsel's assistence was reasonable, we must consider 'all the circumstances.' Strickland, 104 S. Ct. at 2065.
 
 
 15
 The second step in a Strickland analysis is that the defendant must affirmatively prove prejudice. Strickland, 104 S. Ct. at 2067. The defendant is not required to prove by a preponderance of the evidence that the outcome would have been different. Id. at 2068. The showing required of the defendant is
 
 
 16
 that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.
 
 
 17
 .............................................................
 
 
 18
 ...................
 
 
 19
 * * *
 
 
 20
 When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.
 
 
 21
 Id. at 2068-69. In determining whether deficient performance was prejudicial, we 'must consider the totality of the evidence before the judge or jury.' Id. at 2069.
 
 
 22
 Landers asserts numerous specific errors of counsel. We find that, considering the record as a whole, several of the errors identified by Landers demonstrate a lack of reasonable professional judgment by counsel. These errors, while perhaps not singly demonstrative of deficient performance, contribute to a finding of overall ineffectiveness and prejudice.
 
 
 23
 First, Landers asserts that his attorney, in preparing the case before trial, failed to interview three important witnesses. Counsel did not interview the alleged victim, Sherry Landers, nor did he interview Cindy and Phillip Landers. Cindy and Phillip resided in the same house during the two years in which Landers was alleged to have raped and sodomized Sherry many times and also was alleged to have participated in sexual activities with both Sherry and David together. Landers contends that, although Cindy and Phillip were away from the home during most of the period cited in the indictment, the children could have testified that they knew nothing of such events occurring in the previous two years. This testimony would not have contradicted Sherry's testimony, but it could have weakened its impact.
 
 
 24
 Sherry's importance as a witness is incalculable. Ordinarily, a competent attorney would be expected to interview all important witnesses. Defense counsel in this case never spoke with Sherry prior to trial. Counsel explained that he did not interview Sherry for the following reasons: the child was already brainwashed and in custody of her stepomother Vernell or an institution that would be hostile to the lawyer's interviewing Sherry; he already had her written statements; he feared he might be accused of trying to manipulate her testimony; and he was unable to gain access to Sherry. We cannot accept such reasons. We note, as did the state court, that counsel easily could have requested the court to order that Sherry be made available for an interview. In addition, the written statement was brief and was not written in Sherry's handwriting. Because the prosecution's case rested primarily on Sherry's testimony, and the defense strategy rested entirely on discrediting the testimony of Vernell and Sherry, the importance of interviewing Sherry as part of the pretrial preparation was clear, and the failure to interview her constituted performance below the standard of reasonable competence and effort.
 
 
 25
 We recognize that the handling of youthful witnesses is a delicate matter. If the only conduct at issue were counsel's decision not to call the children as trial witnesses, we might consider the decision a strategic one, but the failure to talk with any of these witnesses at all prior to trial cannot be considered a reasonable trial strategy.
 
 
 26
 Landers also asserts that his counsel erred in failing to call David as a defense witness in light of David's recanting of his story and his willingness to testify favorably for his father. We find counsel's decision to refrain from calling David as a witness for the defense was a reasonable tactic in light of David's original statement against his father and David's lack of credibility. In addition, David did testify at trial, albeit as a government witness; the part of his story that was favorable to his father was presented to the jury, so that little, if any, prejudice resulted to Landers from his counsel's decision not to call David as a defense witness.
 
 
 27
 The second major error was counsel's failure to object to critically important hearsay testimony. A medical witness called by the government, Dr. Algrin, testified that he examined Sherry on August 15 after she was taken from her home and that he found no medical evidence of recent trauma to the vaginal or rectal areas. This testimony cast some doubt on the testimony of Sherry, who testified that these sexual acts with her father and brother had occurred four or five times in the week prior to the medical examination. Tr. at 53.
 
 
 28
 When Algrin testified that he found the rectal area to be normal and that there was no discoloration or irritation, the government asked him to refer to his records. The government then showed the doctor the government's copy of the hospital records and asked, 'Doesn't somewhere in those records indicate some abnormal condition to the rectal area?' Tr. at 92. Dr. Algrin responded:
 
 
 29
 Okay now, these [records] are on two different examinations. When I examined her on August 15th, the examination did not show any trauma.
 
 
 30
 .............................................................
 
 
 31
 ...................
 
 
 32
 * * *
 
 
 33
 The other examination which you have shown me was from sometime about the 1st of September and was by Dr. Sandra Moss, and according to that she did notice some excoriation around the anus.
 
 
 34
 Tr. at 92 (emphasis added).
 
 
 35
 Counsel's response to Algrin's testimony regarding Moss's findings is troublesome. It is difficult to understand how a doctor on August 15 could find no evidence of trauma and yet two weeks later a different doctor could find some evidence. Yet Landers' counsel did not object to the introduction of Moss's statement, and the cross-examination by Landers' counsel consisted of only two questions. He asked the doctor to define 'excoriation,' which the doctor said was 'just irritation,' and he asked whether the fact that the hymen was not intact meant that intercourse had occurred, and the doctor answered that, no, it did not mean that. Id.
 
 
 36
 The admissibility of Moss's statement under the Kentucky common-law rules of evidence is questionable. See Buckler v. Commonwealth, 541 S.W.2d 935, 937 (Ky. 1976) (explaining that the business records exception to the hearsay rule governs hospital records if certain requirements are met); Garner v. Commonwealth, 645 S.W.2d 705, 706-07 (Ky. 1983) (approving Buckler and reiterating the requirements for the business records exception). The examination and the hospital records were not made as a routine matter during the course of medical treatment or therapy but were made only for the purpose of the litigation, to prove whether or not a criminal act was committed. Moreover, it does not appear from the record that a proper foundation was laid for this testimony, even if it would have been admissible. In addition, Kentucky law provides that the court may summon the declarant where there exists a bona fide dispute as to the trustworthiness of a business record
 
 
 37
 We believe that a reasonably competent attorney would have objected to this testimony or moved the court to summon Dr. Moss to testify. At the very least, an attorney putting forth reasonable effort and skill would have cross-examined Dr. Algrin further regarding the discrepancy in the medical reports. Counsel's failure to object to the introduction of such crucial testimony, to insist on Dr. Moss's being summoned, or to pursue the inconsistencies on cross-examination of Dr. Algrin cannot be excused as either a trial strategy or a harmless omission.
 
 
 38
 Landers also asserts that his attorney failed during closing argument to demonstrate the numerous important inconsistencies in the testimony of government witnesses. The inconsistencies identified by Landers include the following: Sherry's pretrial statement said that the sexual acts occurred twice in the week prior to being taken from her home by police (Ex. D), but at trial Sherry testified that the acts occurred four to five times that week (Tr. 53); Sherry's pretrial statement said that the sexual acts began two or three years before (Ex. D), but David's statement said that the acts began two to three months before (Ex. G); Sherry testified that she told Vernell about these acts for the first time on the day after Vernell returned home in mid-August (Tr. 57, 62), but Vernell testified that Sherry reported these acts to her six to eight months prior to her talk with Sherry in mid-August (Tr. 81-82); and Sherry testified that she told her grandmother about these acts before August 1978 (Tr. 57), but the grandmother testified that she was informed of the problem by both Sherry and Vernell on the day before the police picked up Sherry in Mid-August (Tr. 125). We further note that counsel never mentioned the discrepancy in the medical reports.
 
 
 39
 While we recognize that it is the jury's task to resolve inconsistencies, see, e.g., United States v. Scaife, 749 F.2d 338, 347 (6th Cir. 1984), we must also recognize that not all inconsistencies or their significance may be readily apparent to the jury. The defense theory in this case depended entirely on convincing the jury that several witnesses were not telling the truth. Thus, it was critically important for the defense attorney to domonstate precisely and emphatically each of the major inconsistencies in the testimony of the government's witnesses. Defense counsel did describe some of the inconsistencies in his closing argument (Tr. 197-200), but the descriptions tended to be sweeping and generalized. Considering the sole theory of the defense, such a broad-brushed treatment is difficult to approve. This weakness of the closing argument, examined alone, does not constitute a lack of reasonably effective assistance, but taken together with the other errors, it leads us to conclude that Landers did not receive reasonable assistance at his trial. We need not discuss the other asserted errors.
 
 
 40
 The second step in our analysis under Strickland is to determine whether there was prejudice. We find that the evidence presented a close case and that there is a reasonable probability that, absent counsel's errors, the jury would have had a reasonable doubt as to Landers' guilt. Considering all the evidence presented to the judge and jury, and considering all the circumstances of the case, we find that defense counsel's performance was deficient and that the trial was unreliable as a result. Although each error was not so glaring that it could individually render the counsel deficient and prejudicial, we conclude that, overall, Landers did not receive effective assistance of counsel. We hold that the district court should have granted the writ of habeas corpus.
 
 
 41
 We are not without deep concern for the child, Sherry, and we regret any further turmoil that further proceedings may entail. Whether she was manipulated by one parent or assaulted by the other, the child was a victim. We cannot, however, disregard the unreliability of a trial in which a person receives a sentence of life imprisonment. We therefore REVERSE the district court and order that the matter be REMANDED for issuance of the writ of habeas corpus unless the State of Kentucky retries the petitioner within a reasonable time.